IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

ANTHONY SHAWN WOODS,

      Plaintiff,

v.

WAGONER COUNTY BOARD OF
COUNTY COMMISSIONERS, et al.,

      Defendants.

Case No. 24-CV-249-JFH-GLJ

## OPINION AND ORDER

Plaintiff Anthony Shawn Woods ("Woods"), appearing *pro se* and proceeding *in forma pauperis*, brings this federal civil rights action pursuant to 42 U.S.C. § 1983. Dkt. Nos. 2, 9. Woods alleges, generally, that the Defendants have violated his rights guaranteed by the United States Constitution and Oklahoma Constitution. *See* Dkt. No. 2 at 7-9.[1]

Defendants Chris Elliott and Ryan Russell, in their individual and official capacities; and Jalen Miller, Corey Haddock, Taryn Mumby, Scott Alsworth, Laci Chandler, Kaylyn Rogers, Marianne Parks and Parker Jones, in their individual capacities (collectively, the "Jail Defendants"), filed a Motion to Dismiss arguing Woods failed to state a claim. Dkt. No. 41. Woods filed a Response in opposition. Dkt. No. 47. The Jail Defendants filed a Reply attaching incident reports. Dkt. No. 48. As a result, the Court provided the parties notice it would consider the additional materials and convert the Jail Defendants' Motion to Dismiss to a Motion for Summary Judgment. Dkt. No. 62. Pursuant to the Court's Order, the Jail Defendants provided additional materials in support of their Motion. Dkt. No. 67. Woods responded to the Jail Defendants' supplemental materials. Dkt. No. 70. The Motion is now ripe for adjudication.

---

[1] The Court's citations refer to the CM/ECF header pagination.

## FACTUAL BACKGROUND

During the period of September 2022 through April 2024, Woods was a pretrial detainee at the Wagoner County Jail.  Dkt. No. 2 at 1; Dkt. Nos. 48-1 through 48-11.  During this period, Woods was placed on "lockdown" by Wagoner County Jail employees on numerous occasions. Dkt. No. 2 at 8; *see also* Dkt. Nos. 48-1 through 48-11 and Nos. 67-1 through 67-13.  Woods claims Wagoner County Jail's procedure of placing him on "lockdown" without notice or a hearing before an impartial tribunal violated his procedural due process and equal protection rights.  Dkt. No. 2 at 7.

## STANDARD OF REVIEW

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir.1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 317.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Durham v. Xerox Corp.*, 18 F.3d 836, 838-39 (10th Cir.1994).

"Even though the Court construes *pro se* pleadings liberally, [Woods] must present factual support for his allegations if he is to withstand [the Jail] Defendants' Motion for Summary Judgment." *Luginbyhl v. Glanz,* Case No. 15-CV-456-JED-TLW, 2017 WL 319216, at *7 (N.D. Okla. Jan. 20, 2017) (unpublished).

## ANALYSIS

Section 1983 does not create substantive rights. Rather it provides a recovery mechanism for deprivation of a federal right. To establish a cause of action under § 1983, a plaintiff must allege: (1) deprivation of a federal right by; (2) a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). In this case, Woods alleges that the Defendants had a policy, effectuated by the jail staff, of placing him on lockdown without proper notice and a fair hearing before an impartial tribunal which violated his procedural due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments. *See* Dkt. No. 2 at 7, 10-12. The Court now addresses Woods' individual claims.

### I.      Procedural Due Process Claim

Woods first claims the Jail Defendants have punished him using "lockdown, UFN's" [2] and max lock downs without notice and a hearing thereby depriving him of procedural due process. Dkt. No. 2 at 7, Dkt. No. 9 at 1, Dkt. No. 47 at 4. Woods identifies several times he was placed on lockdown by the Jail Defendants as demonstrating the constitutional violation. *See* Dkt. No. 2 at 10-12. The Jail Defendants argue Woods has failed to establish his claim. *See* Dkt. No. 41 at 13-15; *see also* Dkt. No. 48.

Due process requires that a pretrial detainee not be punished prior to a lawful conviction. *Peoples v. CCA Detention Centers*, 422 F.3d 1090, 1106 (10th Cir. 2005) (citing *Bell v. Wolfish*,

---

[2] "Until Further Notice." Dkt. No. 47 at 3.

441 U.S. 520, 535 (1979)).  However, the government may subject those awaiting trial to the conditions and restrictions of incarceration so long as those conditions and restrictions do not amount to punishment.  *Id.*

Accordingly, the Court "must ask whether an expressed intent to punish on the part of detention facility officials exists.  If so, liability may attach.  If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction [or condition] in question bears no reasonable relationship to any legitimate governmental objective."  *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (citation and internal quotation marks omitted).  "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."  *Routt v. Howard,* 764 F. App'x 762, 768-69 (10th Cir. 2019)[3] (quoting *Bell*, 441 U.S. at 540).  Thus, "the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."  *Bell,* 441 U.S. at 540.

> If an act by a prison official, such as placing the detainee in segregation, is done with intent to punish, the act constitutes pretrial punishment.  Similarly, if a restriction or condition is not reasonably related to a legitimate governmental goal—that is, it is arbitrary or purposeless—the Court may infer that the purpose of the action is punishment.  ***On the other hand, restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are uncomfortable. Ensuring security and order at the institution is a permissible non-punitive objective.  Thus, no process is required if a pretrial detainee is placed in segregation not as punishment, but for managerial reasons***.

*Meek v. Koonce,* Case No. 14-CV-1335-MSK-KLM, 2015 WL 4944076, at *4 (D. Colo. Aug. 20,

---

[3]  The Court cites all unpublished decisions herein as persuasive authority.  Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

2015) (unpublished) (emphasis added).  Such decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell,* 441 U.S. at 548 (internal quotations omitted).

Woods referenced excerpts from incident reports during his pretrial detention in support of his denial of due process claim.  Dkt. No. 2 at 10-12.  The Jail Defendants provided the following complete incident reports:

> On 9/27/2022 @ 0529 DO Benton asked me to help transport inmate Woods to G4 for housing, I, Katelyn, went to grab a blanket for inmate Woods, when I handed him the blanket inmate woods ripped it out of my hand and stated "youre really disrespectful so Im going to be disrespectful".  Inmate woods then proceeded to tell me "you're lucky i don't try to choke you out".  I asked inmate Woods if that was a threat and he stated "yes you better quit fucking with me, Im a grown ass man" Inmate woods will be placed on a 72 hour lockdown for disrespect and threatening an officer.

Dkt. No. 48-1 (grammar and syntax in original); *see also* Dkt. No. 2 at 10.

> On 5/12/2023 @ APPROX. 12:23 P.M. WOODS, ANTHONY WAS BROUGHT DOWN TO FINGER PRINT BY OFFICER JOHNSON AND OFFICER JONES. WHEN DOWN FINGER PRINTING JOHNSON WAVED ME OVER TO THE PRINT ROOM TO ASK IF HE NEED TO SIGN THE PRINT CARDS AS HE WAS ARGUING ABOUT HIS CHARGES.  I EXPLAINED TO THE INMATE A SIGNATURE IS NOT AN ADMISSION TO GUILT JUST STATING THOSE ARE HIS FINGERPRINTS.   HE CONTINEUED TO ARGUE ABOUT HIS STALKING CHARGE I SAID OKAY ILL PUT YOU REFUSED AND LET JOHNSON KNOW HE CAN TAKE HIM BACK TO HOUSING.  MEANWHILE DURING HIS INTAKE ON 5/9/2023 INMATE WAS ARGUMENTATIVE AND LOUD DURING INTAKE AS WELL AS ARGUMENTATIVE AND LOUD DURING HIS ARRAIGNMENT WITH JUDGE HUNTER.  AT THIS TIME I FELT IT WOULD BE APPROPRIATE FOR THE INMATE TO BE PODDED TO G7 AND PLACED ON A 96 HOUR LOCK DOWN FOR CONSISTENTLY BEING ARGUMENTATIVE AND DISRESPECTFUL TO OFFICERS.

Dkt. No. 48-3 (grammar and syntax in original); *see also* Dkt. No. 2 at 10.

> ON 5/19/23 @ APPROX. 1340 AFTER OFFICERS WERE DONE SHAKING

DOWN G7, (WOODS, A.) OFFICER BOND CAME TO ME TO LET ME KNOW THAT I/M WOODS, A HAD TOLD THEM TO TELL ME THE OFFICER WHO PUT HIM ON A 96 HOUR LOCKDOWN PREVIOUSLY THAT IM A BITCH AND NOTHING BUT PUSSY.  AT THIS TIME I CALLED UP TO TOWER TO PUT I/M ON A 96 HOUR LOCKDOWN FOR CONTINUIOUS DISRESPECT TOWARD J10.  AT 1400 I/M WOODS HIT THE PENDING CALL BUTTON AND I, SGT MUMBY AND OFFICER BOND WENT BACK TO CHECK THE CALL.   AFTER LETTING THE I/M KNOW HE WAS ON A 96 FOR DISRESPECT HE LET ME KNOW HE HAD A TABLET.  AND TOLD ME TO COME AND GET IT.  AT THIS TIME I WENT TO G7 DOOR AND DIRECTED THE I/M SINCE HE IS ON LOCKDOWN I HAVE TO REMOVE THE TABLET. I DIRECTED THE I/M TO PLACE THE TABLET ON THE FLOOR BY THE DOOR AND GO SIT ON HIS BUNK WITH HIS BACK ON THE WALL.  I OPENED THE DOOR AND I/M WOODS, A AND MYSELF COMMUNICATED FOR 15 MINS AND SEEMED TO GET ON THE RIGHT PAGE. I/M WOODS, A UNDERSTANDS THAT TEHRE IS CONSEQUENCES FOR HIS BEAHVIOR AND WAS STILL PLACED ON A 72 HOUR LOCKDOWN WITH THE TABLET REMOVED FOR DISRESPECT.

Dkt. No. 48-2 (grammar and syntax in original); *see also* Dkt. No.2  at 10.

On the above date and approximate time [11/03/2023 07:31], I Lt. Chandler along with Cpl. Prock were in booking when I heard a call over the radio saying there was a fight in G Pod at G11.  Myself and Cpl. Prock were in booking and ran back to the back where we met Sgt. Soma, Davis, Hoover and Ford at the C2 door.  Once in the Pod we informed everyone to lock down.  That is when Inmate Duvall and inmate Woods began to yell back and fo[]rth at each other, which told us those were the two involved.  Officers informed the inmates to lock down once again.  Cpl. Prock was placing handcuffs on inmate Woods, A. when Duvall, N. stepped out of his cell again and began to cuss and yell at the other inmate involved.  Sgt. Soma, Detention officers, Ford and Hoover went upstairs in G Pod to secure G-11 where inmate Duvall, N. was celled.  I Lt. Chandler then cuffed inmate Buchanan and had transported him to his cell.  While transporting Buchanan to his cell inmate Duvall, N. began to hit his window and cuss at officers.  Magor Russell, Lt. Boyd arrived to the pod and went with Sgt. Some, Officer Ford and myself to Duvalls door, at that time I told detention officers Davis and Ford to take inmate Woods, A. to booking so we could further investigate the situation.  Once Inmate Woods, A. was taken out of the Pod Lt. Boyd ordered Duvall, N. to turn around and place his hands on his head.  Lt. Boyd called for the door when the door opened inmate Duvall was getting a drink.  Boyd ordered Duvall to put the cup down and Lt. Boyd restrained inmate Duvall in handcuffs behind the back with no incident.  While Lt. Boyd and Major Russell were escorting inmate Duvall, he began to yell and cuss and refuse to walk down the stairs stating that Lt. Boyd was trying to throw him down the stairs.  After refusing to walk down the stairs multiple times, Major Russell and Lt. Boyd had to use force to escort him down the stairs.  Once out of the Pod inmate Duvall began to get in Lt. Boyds face attem[p]ting to insult and threaten him. When

6

inmate Duvall, N. got into Lt. Boyds face once again Major Russell and Lt. Boyd escorted inmate Duvall to the ground. Myself and Cpl. Prock went to get the restraint chair due to the inmate being a threat to officers. When I got to the B6 door I yelled for officer Davis to go to 83 to get the chair. The rest[r]aint chair was taken back to the C3 door where inmate Duvall was placed into the chair by myself, Sgt. Soma, CPl. Prock, Detention Officers Davis, Hoover and Ford, with Lt. Boyd and Major Russell restraining his legs so he could not harm officer's restraining him. While being placed in the chair inmate Duvall kept telling Boyd that hes dealing with a real criminal and threatening Lt. Boyds family. Once inmate Duvall was rest[r]ained fully in the restraint chair Cpl. Prock was wheeling him towards booking when he spit and got saliva on Lt. Boyds face. The saliva also got on Officer Davis's face and Hoover's arm. Inmate Duvall was placed in holding 2 for observation. Upon reviewing cameras we saw that the inmates were playing cards when inmate Duvall stood up and threw his blanket down. Inmate Duvall and inmate Woods, walked up stairs to G 11 where they were having a verbal altercation and inmate gestures to his cell, he then bumped in to inmate Woods, A. Inmate Duvall, N. then swung at inmate Woods, A. which led to inmate Woods, A. swinging back at him. Inmate Woods, A. then went back down the stairs. Inmate Woods, A. was placed on a 72 hour lockdown for fighting. Inmate Duvall got placed on UFN for placing bodil[]y fluids on an officer, fighting inmates and fighting officers.

Dkt. No. 48-4 (grammar and syntax in original); *see also* Dkt. No. 2 at 10.

On the above date and approximate time [12/28/2023 16:56] I, Lt. Chandler was about to get on the elevator when i heard over the radio "I think they are fighting in G-4". I then ran to the back along with Lt. Boyd, Detention Officer Davis. Once we arrived at G Pod officer's Miller and Murphy were at the G Pod door. We all ran into the pod and once we arrived to G-4 we called for the door to be opened. When the door was opened Inmate Woods, A. was on the ground with inmate Buchanan, F. in a headlock. Lt. Boyd pulled Inmate Woods, A. off of inmate Buchanan, F. myself and Detention Officer Miller restrained inmate Woods, A. and placed him in handcuffs behind the back. We escorted the inmates to separate locations. Both inmates were offered medical attention. After reviewing cameras Inmate Woods, A. was placed on a 72 hour lockdown for fighting. Inmate Buchanan was placed on a 96 hour lockdown for fighting and disrespect to staff.

Dkt. No. 48-5 (grammar and syntax in original); *see also* Dkt. No. 2 at 11; *see also* Dkt. Nos. 67-2 and 67-3.

On 3/25/2024 at approx. 0850 hours myself DO Jones, DO Miller and DO Goldstein where doing a shake down on Anthony Woods in G-6, during the shakedown I found a pi[e]ce of cardboard from a folder covering Woods vent. I had previously given Woods warnings for this multiple times and told him the next time it will be a lockdown. I took it down and notified Woods he was on a 48 hours

7

lockdown.

Dkt. No. 48-6 (grammar and syntax in original); *see also* Dkt. No. 2 at 11.

> On 3/26/2024 AT APPROXIMATELY 0730 HOURS I OFFICER MILLER AND CPL RICH WAS PASSING MEDS WITH MEDICAL 2 IN G-POD I/M WOODS WAS GIVEN HIS MEDS HE THEN WALKED AWAY FOR US, CPL RICH THEN TOLD I/M WOODS TO COME BACK SO HE CAN CHECK HIS MOUTH AND HIS CUP I/M WOODS IGNORED CPL RICH. I THEN ADVISED WOODS "LET ME JUST CHECK YOUR MOUTH" WOODS THEN WALKED TOWARDS ME AND GOT INTO MY FACE AND GOT CHEST TO CHEST WITH ME I THEN STUCK BOTH OF MY ARMS OUT TO CREATE SPACE BETWEEN I/M WOODS AND MYSELF FOR MY SAFETY I THEN ADIVSED I/M WOODS THAT HE WAS ON A 72 HOUR LOCK DOWN[.]

Dkt. No. 48-7 (grammar and syntax in original); *see also* Dkt. No. 2 at 11; *see also* Dkt. No. 67-4.

> ON 04/07/2024 AT ABOUT 1300 DETENTION OFFICER JONES (J202) CAME TO BOOKING FROM TOWER AND STATED THAT INMATE ANTHONY WOODS WAS ACTING OUT IN GPOD AND MAKING ASSAULTIVE REMARKS ABOUT DTENTION OFFICER MILLER (J203). CORPORAL RICHARDSON (J201), DETENTION OFFICER JONES (J202), AND DETENTION OFFICER GOLDSTEIN (J206) WENT TO GPOD TO TALK TO INMATE ANTHONY WOODS AT ABOUT 1313, INMATE WOODS STATED THAT HE WAS GOING "TO UNLEASH HIS FURY" ON D[E]TENTION OFFICER MILLER (J203).  A LITTLE BIT LATER INMATE WOODS WAS OBSERVED ON THE CAMERA MESSING WITH THE SHOWER SCRUB BRUSH, INMATE WOODS HAD UNSCREWED THE SCRUB BRUSH HANDLE FROM BRUSH PART AND PLACED IT BEHIND WHERE HE WAS SITTING.  CORPORAL RICH AND DETENTION OFFICER JONES WENT TO GPOD TO REMOVE THE SCRUB BRUSH FROM THE POD, AS SOON AS THEY EXITED GPOD INMATE WOODS PLACED THE BROOM WHERE THEY JUST MOVED THE SCRUB BRUSH FROM.  AT 1530 DETENTION OFFICER JONES, DETENTION OFFICER MURPHY, D[]ENTENTION OFFICER MILLER, CORPORAL RICH, AND MYSELF, S[E]ARGE[]NT ROGERS ENTERED GPOD TO DO A SIGHT CHECK.  INMATE WOODS STATED THAT HE "WAS NOT GOING TO DO ANYTHING TO D[E]TENTION OFFICER MILLER WITH ALL THESE OFFICERS AROUND." THIS INCIDENT WAS RECORDED ON MY BODY CAMERA (SIN: X60AB238U). MAJOR RUSSELL (J50) WAS CONTACTED REGARDING THIS ISSUE AND ADVISED US TO PLACE INMATE ANTHONY WOODS ON MAXIMUM SECURITY.

Dkt. No. 48-11 (grammar and syntax in original); *see also* Dkt. No. 2 at 11; *see also* Dkt. Nos. 67-5. 67-6, 67-7 and 67-8.

8

ON 4-20-24 AT APPROX: 22:20 D/O CALLAHAN AND MYSELF CPL. HADDOCK RESPONDED TO A PENDING CALL IN M-8. WHEN WE ARRIVED I/M WOODS, []ASKED IN AN AG[G]RESSIVE MANNER WHY HE WASN'T THE FIRST TO GET HIS "HOUR OUT." WHILE I WAS TRYING TO EXPLAIN TO HIM THAT HE HAD GONE FIRST THE NIGHT BEFORE 4-19-24 AND THAT OTHERS SHOULD HAVE A CHANCE TO GO FIRST. I/M WOODS, A STARTED YELLING AND CURSING AT MYSELF AND D/O CALLAHAN AND THEN PROCEEDED TO KICK HIS DOOR REPEATEDLY. I CPL. HADDOCK PLACED I/M WOODS ON A 48 HOUR OUT RESTRICTION.

Dkt. No. 48-9 (grammar and syntax in original); *see also* Dkt. No. 2 at 11; *see also* Dkt.

No. 67-9 at 1.

ON 5/18/24 @APPROX. 1612 TOWER CALLED FOR A COUPLE OFFICERS TO M-POD FOR AND ARGUMENT BETWEEN TWO INMATES. I , SGT. ALSWORTH, WAS IN THE PARKING LOT AT THE TIME OF THE CALL AND STARTED TO REENTER THE FACILITY. BEFORE REACHING THE Al DOOR A CODE ORANGE CALL CAME ACROSS THE RADIO. DO'S STURM AND WARNER WERE ALREADY IN ROUTE TO M-POD AND I FOLLOWED BEHIND. I KNEW THAT Ml WAS RIGHT BEHIND ME SO I MADE THE DECISION TO CONTINUE TO M-POD AS Ml WOULD HOLD DOWN BOOKING. UPON MY ARRIVAL OFFICERS STURM AND WARNER WERE CUFFING INMATE WOODS AND I WENT TO M-7 WHERE INMATE DUVALL WAS LOCKED IN HIS CELL. I PLACED CUFFS ON DUVALL AND TOOK HIM TO THE END OF THE LANDING TO DISCUSS THE SITUATION, WHERE I WAS INFORMED THAT WOODS HAD ASKED HIM FOR THE CLIPPERS TO WHICH DUVALL REPLIED "COME UP AND GET THEM WHENEVER YOU WANT, I'M DONE WITH THEM." WOODS CONTINUED TO CONSORT WITH INMATES ON THE GROUND LEVEL AND ANOTHER INMATE WENT TO THE SECOND FLOOR AND RETRIEVED THE CLIPPERS. AT THIS POINT DUVALL STATED "WOODS CALLED ME A PUNK ASS BITCH AND WHY DID YOU FUCKING GIVE THEM TO THE OTHER PERSON" THIS CONTINUED WITH WOODS SCREAMING AT HIM AS HE WENT UP THE STAIRS. INMATE DUVALL STATED THAT GOODMAN AND HYATT SEPERATED THEM AND SHOVED HIM TO HIS CELL, BUT HE HAD TRIED TO SWING AT WOODS THEN GOODMAN SHUT HIM IN HIS ROOM.

OFFICERS STURM AND WARNER HAD WOODS IN THE HALL OUTSIDE M-POD AND I INSTRUCTED STURM TO TAKE WOODS TO MEDICAL. I PLACED DUVALL BACK IN HIS CELL AND INFORMED HIM THAT I WOULD MOST LIKELY BE BACK TO INFORM HIM OF HIS LOCK DOWN, TO WHICH DUVALL STATED THAT HE UNDERSTOOD.

9

> I THEN WENT BACK OUTSIDE TO DISCUSS THE EVENTS WITH LT.CHANDLER AND ASKED IF MISTY COULD REVIEW CAMERAS TO ACCESS THE EVENT, TO WHICH PERMISSION WAS GRANTED. IT WAS DISCUSSED WITH LT.CHANDLER THAT WOODS HAD ASKED TO BE HOUSED SOMEWHERE ELSE EARLIER IN THE DAY BUT I WAS UNABLE TO MAKE THAT WORK. LT.CHANDLER CALLED MAJOR RUSSELL AND HE SAID TO PLACE WOODS ON PROTECTIVE CUSTODY. MISTY AND MYSELF REVIEWED CAMERAS AND THE STORY I HAD RECIEVED FROM DUVALL PROVED TO BE ACCURATE. WOODS WAS THE AGGRESSOR AND DUVALL DID TRY TO SWING AT WOODS. LT. CHANDLER WAS CALLED AND IT WAS DISCUSSED WHAT LOCKDOWNS TO HAND OUT. I INSTRUCTED OFFICERS STURM AND WARNER TO TAKE WOODS BACK TO M-9 AND AFTER FINISHING MY DISCUSSION WITH LT. CHANDLER I WENT TO M-POD WITH OFFICER STURM AND INFORMED WOODS HE WAS PLACED ON PC AND THEN DUVALL THAT I WAS LOCKING HIM DOWN FOR 72 HOURS, BOTH FOR FIGHTING.

Dkt. No. 48-10 (grammar and syntax in original); *see also* Dkt. No. 2 at 12.

> ON 7/1/24 AT APROX 10311 CPL PARKS AND DO GOLDSTEIN WAS DOING SHAKEDOWNS IN G-7 AND DO JONES AND DO OSBORNE WERE DOING SHAKEDOWNS IN G-10. WHEN MYSELF AND DO GOLDSTEIN FINISHED SHAKING DOWN G-7 I HEARD I/M WOODS YELLING AT DO JONES AND DO OSBORNE. SO MYSELF AND DO GOLDSTEIN WENT DOWN STAIRS TO FIGURE OUT WHAT WAS GOING ON. I ASKED I/M WOODS WHAT WAS WRONG AND HE CONTINUED TO YELL AND SAID "THIS BITCH WON'T SIT MY DEODORANT BACK UP" REFERRING TO DO OSBORNE. I/M WOODS ALSO STATED THAT HE WASN'T LOCKING DOWN UNLESS DO OSBORNE SAT HIS DEODORANT BACK UP. SO AT THAT TIME I WENT AND SAT THE DEODORANT BACK AND I TOLD I/M WOODS TO GO LOCKDOWN, AS I/M WOODS WAS GOING TO LOCKDOWN HE TURNED AROUND AND SAID "FUCK YOU BITCH" TO DO JONES. SO AT THAT TIME I PLACED I/M WOODS ON A 96 HOUR LOCKDOWN DUE TO DISRESPECT TO OFFICERS.

Dkt. No. 48-8 (grammar and syntax in original); *see also* Dkt. No. 2 at 12.

Woods further alleges his lockdown from July 1, 2024, was upgraded to "until further notice" without any notice. Dkt. No. 2 at 12; *see also* Dkt. No. 67-12. Woods did not produce any evidence to support his claim or dispute the Jail Defendants' evidence. Dkt. No. 70.

In all, the evidence presented shows Woods was placed on lockdowns because he was disrespectful to jail staff, threatened violence to the jail staff and engaged in altercations with other

inmates.  Each incident and lockdown cited by Woods bore a reasonable relationship to a legitimate governmental objective:  maintaining jail security.  *Blackmon,* 734 F.3d at 1241; *Routt,* 764 F. App'x at 768-69.  "Ensuring security and order at the institution is a permissible non-punitive objective."  *Meek,* 2015 WL 4944076, at \*4.  Therefore, Woods has failed to establish a deprivation of a federal right, and Defendants Ryan Russell, Jalen Miller, Corey Haddock, Scott Alsworth, Mariana Parks, Katelyn Rogers, Taryn Mumby, Laci Chandler and Parker Jones, in their individual capacities, are entitled to judgment as a matter of law.

Furthermore, Woods alleges, "Sheriff Elliott's formal regulation, policy is a widespread, permanent and well-settled custom, and as final policy maker's ratification of both an employee's unconstitutional actions and the basis for them."  Dkt. No. 2 at 9; *see also* Dkt. No. 47 at 3-4.  The Court understands this allegation as a claim against Sheriff Chris Elliott ("Sherriff Elliott") in his individual capacity on supervisory liability.  "[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement; (2) causation[;] and (3) state of mind."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Under the first element, Woods "must show an 'affirmative link' between the supervisor and the constitutional violation."  *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted).  Woods can show such a link by establishing "the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy, or "the establishment or utilization of an unconstitutional policy or custom *provided the policy or custom resulted in a violation of the plaintiff's constitutional rights*."  *Burke v. Regalado,* 935 F. 3d 960, 997 (10th Cir. 2019) (emphasis added; internal quotations and citations omitted); *see also Martinez*

11

*v. Beggs,* 563 F.3d 1082, 1092 (10th Cir. 2009) (A defendant "cannot be held liable in his induvial capacity for implementing county policies . . . under a theory of supervisory liability, when there was no violation of [plaintiff's] constitutional rights."). Woods cannot satisfy the first element. Since the Court concluded the Defendant Russell, Miller, Haddock, Alsworth, Parks, Rogers, Mumby, Chandler and Jones did not violate Woods' constitutional rights, Sheriff Elliott cannot be held liable as a matter of law.[4]

Therefore, the Jail Defendants, in their individual capacities, are entitled to judgment on Woods' procedural due process claim.

## II.      Equal Protection Claim

Woods also claims he has been denied equal protection. Dkt. No. 2 at 8. "Proof of racially discriminatory intent or purpose is required to demonstrate a race-based violation of the Equal Protection Clause," *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996), and "a plaintiff in an equal protection action has the burden of demonstrating discriminatory intent," *Watson v. City of Kanas City, Kan.,* 857 F.2d 690, 694 (10th Cir. 1988). Although "[t]he discriminatory purpose need not be the only purpose, ... it must be a motivating factor in the decision." *Villanueva*, 85 F.3d at 485 (quotation omitted). Thus, to survive summary judgment, Woods must go beyond the allegations in his pleadings, and he must set forth specific facts showing that race was a motivating factor in the Jail Defendants' alleged constitutional violation. *See Watson*, 857 F.2d at 694.

Woods has failed to meet this burden. The Complaint is devoid of any allegation that Woods is a member of a racial minority or any other suspect classification. *See* Dkt. No. 2. This alone is sufficient to dismiss Woods' claim based on failure to state a claim. However, after being

---

[4]  To the extent Woods is attempting to assert an individual capacity, supervisory liability claim against Defendant Russell, the jail administrator [*see* Dkt. No. 47 at 8], this claim fails for the same reasons.

provided with an opportunity to respond to the Jail Defendants' materials, Woods failed to put forth any admissible evidence showing the Jail Defendants placed him on lockdown or otherwise violated his constitutional rights because of his race or other suspect classification. *See* Dkt. No. 70. Thus, the Jail Defendants, in their individual capacities, are entitled to judgment on Woods' equal protection claim.

### III.   Failure to Train Claim

Woods also alleges "Wagoner County Sheriff's Department has failed to properly train, supervise and monitor is jail employees." Dkt. No. 2 at 9; *see also* Dkt. No. 47 at 3 ("Defendants Sheriff Elliott and Jail Administrator Russell have failed to properly train, supervise and monitor the detention officers."). To the extent Woods is attempting to allege a supervisory liability claim against Sheriff Elliott and Defendant Russell for failure to train the jail staff, this claim fails. These defendants "cannot be held liable in his individual capacity … for actions of [jail employees] under a theory of supervisory liability, when there was no violation of [Woods'] constitutional rights." *Martinez*, 563 F.3d 1092; *accord Burke*, 935 F.3d at 1010 (stating that a supervisor may not "be held liable based on an unconstitutional policy where there is no evidence of a constitutional violation by any individual subordinate"). Therefore, Sheriff Elliott and Defendant Russell, in their individual capacities, are entitled to judgment on Woods' failure to train claim.[5]

---

[5] The Jail Defendants also contend they are entitled to qualified immunity. Dkt. No. 41 at 17-20. As explained, Woods failed to proffer evidence sufficient to raise a genuine issue of material fact that a constitutional violation occurred. Therefore, the Court's qualified immunity inquiry ends here, and the Jail Defendants are entitled to summary judgment. *Estate of Larsen ex rel Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) ("Reviewing summary judgment in the qualified immunity context involves a two-part inquiry. First, the plaintiff must establish the defendant violated a constitutional right. If no constitutional violation is established by the plaintiff's allegations or the record, our inquiry ends." (internal citations omitted)).

## IV.   Official Capacity Claims

Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978); *see also Kentucky v. Graham*, 473 U.S. 159, 165 (1985). A claim against a government actor in an official capacity "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standards applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

To hold a county or municipality liable under § 1983, a plaintiff must demonstrate: (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right; and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "that there is a direct causal link between" the policy or custom and the injury alleged). *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. 658; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Further, the absence of a constitutional violation by the officers of a county precludes a finding of liability against the county itself. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

### a.   Defendant Russell

Woods indicates he is suing Defendant Russell in his official capacity as well. Dkt. No. 2 at 2. Woods identifies Defendant Russell as the "Jail Administrator[.]" *Id.* at 3. To establish an official capacity claim, the officer must have final policymaking authority. *See Milligan-Hitt v. Bd. of Trustees of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1223-24 (10th Cir. 2008). "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citations omitted) (emphasis in original).

14

Under Oklahoma law, the jail administrator does not set the policies or procedures for the Wagoner County Jail. Instead, the sheriff has charge of the county jail and its prisoners. Okla. Stat. tit. 19, § 513; Okla. Stat. tit. 57, §§ 47, 52; *see also Lopez v. LeMaster,* 172 F.3d 756, 763 (10th Cir. 1999) ("Under Oklahoma law, a county sheriff is in charge of the jail and the prisoners therein."). Therefore, Defendant Russell has no official capacity with regard to the Wagoner County Jail. *Mouton v. Gold,* No. 06-CV-550-RAW-SPS, 2009 WL 2900309, at *3 (E.D. Okla. Sep. 9, 2009) (dismissing official capacity claim against jail administrator); *Logan v. Regalado,* No. 20-CV-303-GKF-FHM, 2021 WL 819106, at *3 (N.D. Okla. Mar. 3, 2021) (same). Therefore, Defendant Russell, in his official capacity, is entitled to judgment as a matter of law.

### b.  Sheriff Elliott

Woods asserts he is also suing Sheriff Elliott in his official capacity. Dkt. No. 2 at 2. As explained above, Woods did not establish a constitutional violation by any individual jail defendant. Accordingly, Woods cannot demonstrate an essential element of his official capacity claim against Sheriff Elliott: that a municipal employee committed an underlying constitutional violation. *See Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998); *see also Hinton*, F.2d at 782. For this reason, Sheriff Elliott, in his official capacity, is entitled to judgment as a matter of law.

### c.  Wagoner County Board of Commissioners

The Court notes Wagoner County Board of Commissioners was served on March 20, 2026, but has not yet filed an answer or dispositive motion. *See* Dkt. No. 71. Having analyzed Woods' claims against the Jail Defendants, the Court evaluates, pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A(b), Woods' claims against Wagoner County Board of Commissioners. Woods names Wagoner County Board of Commissioners as a defendant [Dkt. No. 2 at 2] and alleges his

15

"federally and state secured rights have been [] denied by [] defendants due to their unconstitutional [] practice, custom and policy of the County of Wagoner, and its final policy maker Sheriff Elliott, and the county employees he has hired and trained." Dkt. No. 2 at 9.

Having found there is no underlying constitutional violation, Woods cannot prevail on his claim against Wagoner County Board of Commissioners. *Hinton*, F.2d at 782. For these reasons, the Woods' claims against Wagoner County Board of Commissioners are not cognizable, and shall be dismissed.

## V.       Request for Injunctive Relief

Woods alleges he is seeking "injunctive relief from the policy and practice of Wagoner Detention Center employee's (detention officers) of lockdown, UFN's (until further notice) without procedural due process." Dkt. No. 9 at 1. However, Woods is no longer detained at the Wagoner County Jail. Dkt. No. 44. Therefore, any request for injunctive relief against the Jail Defendants is moot. *See Jordan v. Sosa*, 654 F.3d at 1012, 1027-28 (10th Cir. 2011).

## VI.      State Law Claims

While not developed, Woods also asserts a claim under the Oklahoma Governmental Tort Claims Act ("GTCA") and the Oklahoma Constitution. *See* Dkt. No. 2 at 8-9. Under Oklahoma law, "[t]he GTCA is the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort." *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2009). The GTCA defines a "tort" as "a legal wrong, independent of contract, involving violation of a duty imposed by general law, statute, the Constitution of the State of Oklahoma, or otherwise, resulting in a loss to any person, association or corporation as the proximate result of an act or omission of a political subdivision or the state or an employee acting within the scope of employment." Okla. Stat. tit. 51, § 152 (14). The GTCA generally immunizes "the state, its political subdivisions, and

16

all of their employees acting within the scope of their employment" from liability for torts.  Okla. Stat. tit. 51, § 152.1(A).  In fact, under the GTCA, county officers and employees may not be named as defendants in a tort action unless the plaintiff alleges the officers or employees "did not act within the scope of employment."  Okla. Stat. tit. 51, § 153(C).  The immunity provided by the GTCA is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the GTCA.  Okla. Stat. tit. 51, § 152.1(B).

The GTCA also has specific notice-of-claim and denial-of-claim provisions. *See* Okla. Stat. tit. 51, §§ 156, 157.  Compliance with these provisions is a jurisdictional prerequisite for the GTCA's waiver of sovereign immunity to become effective.  *Shanbour v. Hollingsworth*, 918 P.2d 73, 75 (Okla. 1996); *Griffey v. Kibois Area Transit System*, 328 P.3d 687, 690 (Okla. Civ. App. 2013).  Significantly, the "[f]ailure to present written notice as required by the GTCA results in a permanent bar of any action derivative of the tort claim."  *Harmon v. Cradduck*, 286 P.3d 643, 652 (Okla. 2012) (citing Okla. Stat. tit. 51, § 156(B)).

Here, nothing in the Complaint suggests, and Woods failed to provide evidence to demonstrate, compliance with the GTCA's notice-of-claim and denial-of-claim provisions.  Therefore, the Court lacks jurisdiction over this claim.  *Wirtz v. Regalado,* Case No. 18-CV-599-GKF-FHM, 2020 WL 620663, at * (N.D. Okla. Feb. 10, 2020) (unpublished).

## CONCLUSION

IT IS THEREFORE ORDERED that the County Jail Defendants' Motion to Dismiss [Dkt. No. 41], which the Court converted to a Motion for Summary Judgment after giving the parties proper notice [*see* Dkt. No. 62], is GRANTED.

IT IS FURTHER ORDERED that Woods' claims against the Wagoner County Board of Commissioners are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A(b).

IT IS FURTHER ORDERED that Woods' state law claims are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED that this is a final order terminating this action.

IT IS FURTHER ORDERED that a separate judgment shall be entered herewith.

Dated this 27 day of March, 2026.

_____
JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE